We'll be proceeding with the next case on today's docket and that is the case in re Marriage of Carr. And we have the attorneys present. We have Attorney Prince Blood for the appellant. And Attorney Lincoln for the accolade. You may proceed Mr. Blood when you're prepared to. Thank you your honor. May it please the court for the audio record. My name is Curtis Blood and I represent the appellant Holly Carr now Williams. And we are here from the circuit court of St. Clair County. And in the circuit court the court gave the father the majority of parenting time while the child is school aged. The father's home will be the child's home while the child is in school. And we're asking the court to vacate that judgment. Our request is based on a number of orders of fact that the trial court made in the order of appeal. Not everything that the trial court found was wrong. I don't know that I want to defend the position that half of the things that the trial court found were wrong. But enough things were found that it's not just isolated points. It's enough here that we do not have confidence that the judge understood the situation. That the judge understood the facts. And I'd like to go through some considerations for this court that the circuit court should also have if this court vacates the judgment and remands it. But first I'd like to mention something about the record and what this record taught me. This record has 800 pages of transcripts and a decent common law record. That's 800 is kind of a lot of transcript for family case. But not to be lost is that there are about 236 pages of exhibits. As I read the record I noticed that the parties hadn't talked by phone in over a year. And my first thought was they're really not getting along. And then I realized I had not talked to my beloved daughter by phone in over a year. It's just not how we talk. These are young people. They don't. They email. They text. They don't get on the phone. And the byproduct of an emailing and texting life is that your discussions with each other are producible in court on paper. The texts can come in. The emails can come in. And we have hundreds of pages of them in this record. And so we're so often in a family court case it's he said, she said, no, I didn't say that. Yes, you did. Well, in this case, we've got it. In this case, we've got it. And if you miss the emails in this case, you're missing the case. And I had a lot of trouble with that myself. I'm used to giving the transcripts much more weight than the exhibits. But it's 2016. I've got to grow up. No, it's not. It's 2018. I've got to grow up. I've got to start looking at the emails. The exhibits are all different now. And I just want to emphasize that because I think that our trial counsel, our first trial counsel, seems to have kind of missed that. I, at first, missed that. I think the trial court missed that, had a little trouble getting the court's mind around the fact that you could go right there. Any question about what happened, bang, it's in the emails. Just look at the emails. It's right there. We've quoted them extensively in our brief, and they're there for the court to see. And with that said, an important point made. The big question here, I think, is a harmless error. There's no question the court made mistakes. The question is, when you hear what the mistakes are, then look at what the court also got right. Do you get the idea that sending it back to the trial court for another look, does it envision, do you envision the snowball's chance in hell? In which case, we have no business going back. And maybe you do. But I'd like to suggest that if there's any doubt in your minds after this argument about whether the trial judge would do the same thing, give another chance, that you ought to give the benefit of the doubt to us on that doubt. Because I think the judge is in a better spot than this court to say, yes, those mistakes made a difference. I didn't know that. And if I had known that, I wouldn't have looked at the case the same. I wouldn't have looked at the parties the same. Counselor, if you're suggesting that the trial court, something the record shows the trial court made, did it consider the e-mails or, I mean, I know you said dealt with the e-mails, okay. Does that, you know, where the trial court, we send it back, what's the trial court going to do differently? What's your position on that? Well, of course, the trial court might just say, I'm going to bury it even deeper this time. I'm not going to do the same thing. I'm going to write it up then. But now we're getting to the meat of my argument. The thing that's going to change, one thing that's going to change is the trial court is going to realize that she didn't know my client. Well, and to follow up, were they part of the record, the e-mails and texts? Yes. So, but we are to presume that the court did consider those. Yes. Okay. Thank you. And like I said, I don't think the first trial counsel, our first trial counsel realized that when they were in the record then. But on remand, of course this case was remanded, on remand our second counsel had a much better grasp of that and had them in. Yes, they were all in. Every word. And when I look at the findings that are not correct, it's based on the e-mail and I get the impression that the court just didn't get into the e-mail. Did not consider the e-mail. Is that, I can still unclear what you're really arguing at. Well, you know, the judge finds black and the e-mail says white. Okay. And I think how did the judge miss that? Okay. And I understand the first two. I thought you weren't reading them at first. That's why. That's why. I tend to look at the transcripts. I read the comment on the record, then I look at the transcripts, then I see, then I start looking at the exhibits. Is there any indication that we will find in the record that the court read the e-mails and text messages? Any reference to them? There often is. If I could see, I think the judge specifically mentioned the exhibits in the order of appeal. But if I could be wrong on that, I think the judge specifically mentioned the exhibits. Just as the exhibits. But there's no question they were offered, no question they were admitted. Something else that the trial court will have to consider if this court vacates is that the other side has kind of misled the judge. The judge didn't understand the facts. The judge made mistakes. But there was a motion to reconsider. Everybody was in the courtroom. This could have been straightened out. Thank you for the judgment, Your Honor, but you did make a mistake on this. You did make a mistake on that. It wasn't done. The other side kind of hung the judge out to dry on this and now here we are. These things could have been straightened out. And so now, if you do send this case back, then they're going to have to explain that to the judge and maybe the judge is going to view the case a little differently for that reason. Maybe the dad is not perfect anymore. Maybe now that he's misled the court, maybe that's going to make a difference. The age, the age of the things that we're talking about. Yes, there's accusations that stick here. There's about the choice of a doctor. There's about the head start. Yes, yes, that's true. That's true. But it's old. It's also old. She's done better. Some of the good findings are bad. Some of the findings that the judge made, I mean, yes, they're good, but no, they're bad. Like my client's husband said, I'd like to adopt her. I'd like to adopt the child. Of course there's a rule that you don't count against the parent what doesn't affect the child. That wasn't even my client's statement. That's sweet. It's a sweet statement. I mean, how much bad can you make out of, you know, I wish I could adopt that little girl. How bad is that? Or my client saying in an e-mail, which was faithfully produced, asked for it, produced it, said to her husband in an e-mail, joint decision making will be the death of me. Well, it is hard. It is hard. And how much do you make of that, really? But there it is. That's a finding against us. And I can't argue. She said it. It's true. But what's it like? I mean, maybe if this case is remanded, the trial court review of the rest of this will see that a little differently. Well, the trial court made several findings, and you've mentioned a couple of statements. But, I mean, the trial court looked at everything. I mean, in total, it wasn't like the trial court would judge on his or her hat on this statement, I want to adopt. I mean, these were a number of findings, correct? Yes. I mean, that's what trial judges do all the time, make a number of findings, look at everything together, and they're there to judge the credibility, weigh the evidence. Oh, yes, Your Honor, and I'm not complaining about that. I'm only saying that given another chance and seeing that she was wrong on other stuff, seeing that she was misled, maybe the court will see those things a little differently. That's all I'm saying. You know what? At worst, the stuff that my client was accused of, if I can call it accused, she's not exactly Jack the Ripper. She's accused of arranging medical care 250 miles away from the father's house up in Watsika without keeping her ex-husband informed of the details where and when, what doctor, and she should have. She should have. And she's been called on. She's been sanctioned for it. It's a misjudgment. Maybe the judge will see that differently. The awful truth is she found her daughter a local doctor. That's the awful truth. Found her daughter a local doctor. And when you think about it, didn't the dad know that that was going to happen? I mean, was it that much of a shock that she found a source for medical care 250 miles away where the child was going to spend half of her time? Just how big a shock is that? It sounds more like a failure of communication to me. Okay, the judge found it. The judge found against her on it. Okay, I'm just saying it's not awful. And I'm a man that can be looked at differently. Did she not also say something about who was the father of the child? She didn't put him down as the father, did she? Well, that is true. She didn't put her new husband down as the father? In those documents, I can't swear either way. There's so much of it. I know that she ran into a continual problem, and I got called on it too, where the question wasn't, well, the question repeatedly was, who's your emergency contact? Who's your emergency contact? Well, you say, who's your emergency contact? I mean, I don't think of my daughter. She's a monster. She's not an emergency contact. She wants to know if something happens to me. But there's no problem putting her as somebody who's going to come and hold my arm. She's out of the picture. So my client said that she got tripped up on that. And it makes sense. An emergency contact? Somebody who's 250 miles away? That seems to be the problem. She never denied that the father was the father. Something else that I think is going to come into focus on remand, and it has a little bit already, is my client's kind of laid back about parenting. I mean, Darden got scratched. Well, that's the way it goes. But, I mean, we're up against a good legal team and a father who knows what to do with it. And to his credit, I mean, he's a good client. He does well in court. But his court can't and doesn't let this courtroom in a parenting case come down to a lawyer contest. I mean, you've got to put that aside. Because you're not here about who's the best lawyer. You're here about the best interest of the child. And it's the same thing with the parents. It's not a contest over who can do best in the courtroom. It's an attempt to figure out who can do best on the street. Thank you, and you'll have the opportunity to start with bottles. Mr. Blatt. Thank you. Ms. Blintford. Did I do better this time? Yes. May it please the court, counsel. Again, my name is Janie Lintbet, and I represent the appellee in this matter, David Carr. In response to some of the comments made by Mr. Blatt in his oral argument this morning, I want to point out to the court that this is the second appeal in this matter, filed by Hawley. The first appeal was remanded back to the trial court. However, it was remanded by this court because the trial court judge did not issue specific factual cases for each of her findings pursuant to the statute. Essentially, she did not list out each factor and list her findings in support of each factor in the order. So in order to have a more detailed and supported order, this court remanded the matter back to the trial court. The same judge heard the rehearing of this case. It took place over three days, and she issued, the trial court judge issued, again, the exact same ruling. So I know Mr. Blatt argued that essentially if the court had another chance to review the evidence again, then the court might come to a different conclusion. I don't think that that's true because it didn't happen the second time it came in front of the court. The trial court also did not change its ruling during the first motion to reconsider and the first appeal or during the motion to reconsider and the second appeal. As to the e-mails that were part of the evidence in this case, the court did consider those e-mails because in the court's 19-page order in this matter that's being appealed by Hawley, the court explicitly references those e-mails and the discussions between the parties in those e-mails. The issue that I think Hawley is missing in the court's ruling this time and in the last time is that there are factors that the court has to consider in determining who has the majority of parenting time and what the child's residence is going to be. Each of those factors, the court supported its determination based on the evidence and the testimony of Hawley and David. Hawley has a pattern of making unilateral decisions for the minor child in this matter, AC, and not involving David in making those decisions. She will inform him afterwards or after things have changed or even after he receives paperwork and confronts her that the primary care doctor has changed. It's not simply finding medical care for the minor child in the third location that Hawley has moved to in two years. It's that every time Hawley moves, every few months, she changes AC's primary care doctor. She changes her daycare facility and informs David of the change after it's done. The brunt of Hawley's arguments in this appeal is essentially her splitting hairs and parsing words contained in the court's order to try to negate the findings. Mr. Blunt himself admitted today that they even believe most of the court's findings were correct. I know that Mr. Blunt stated that David is also guilty of misleading the court. I'm not really sure where that would have taken place. I don't really see that anywhere in Hawley's brief where David misled the court or supported any misrepresentations. The findings in court are clearly consistent with the testimony and the evidence. I know that this court asked Mr. Blunt about Hawley's failure to include David in paperwork or list him as the father. In multiple occurrences, Hawley failed to list David as the father for medical records, medical forms for the new primary care doctors that she would constantly choose, and she failed to list David as A.C.'s father on school records. It's not simply not including David as an emergency contact. It's not even acknowledging that David is A.C.'s father. And what that does is it prevents him from being able to access medical records, from being able to communicate with doctors and educators and providers. It isn't David micromanaging one form that was submitted and taking issue with that. It's a much bigger problem, especially with joint parenting, which is what the parties are supposed to be doing. The actions that Hawley has taken throughout these proceedings and the few incidents that she brings up in her brief just show her constant behavior and actions and propensity to push David out of decision-making, to keep him out of the loop as far as significant things that are happening with A.C. With the issue of the primary care physician and David not being informed of the new primary care physician that was listed on a preschool registration form, again, Hawley did mention at one point that she was potentially considering a certain primary care physician. She never discussed it with David before actually effectuating the change and listing A.C.'s primary care physician as this new doctor that Hawley had chosen. Hawley got engaged in March of 2015 and realized or was found out that upon getting married, A.C. would no longer be able to be covered by Hawley's health insurance, that Hawley would be moving about an hour and a half, I think it was a little bit over 100 miles from where she was currently residing, and that A.C. was going to need to find a new daycare to go to. She decided to wait to tell David until less than 30 days before that was even happening and then told David at that point that her new husband could cover A.C.'s health insurance. When David expressed his discomfort at that and asked Hawley to hold off on making any changes that they disagreed with until he went to court the following month, Hawley still added A.C. to her husband's health insurance coverage and then on following preschool and medical forms listed her husband, her new husband's insurance as the minor child's primary coverage. Mr. Blood brought up what the issue is with Hawley discussing the fact that her new husband wants to adopt A.C. The issue is Hawley's behavior, again, has been solely to cut David out of the picture, to make decisions on her own, to make decisions with her new husband regarding A.C. And essentially trying to place her new husband in the father role that David has. That wasn't even an issue that was appealed in Hawley's brief, but I did want to mention that one of the factors to be considered by the court, and that was considered by the court, is each parent's actions in fostering a relationship between the child and the other parent. Essentially by making all these decisions without David, by talking to her husband about adopting A.C., by listing her husband's insurance as A.C.'s primary insurance, by not listing David as A.C.'s father on medical and education-related forms, Hawley's not fostering that relationship. And rather than arguing about the trial court and the specific verbiage used on whether Hawley informed David of these changes or actually discussed them as she's supposed to do pursuant to joint parenting, Hawley's, again, like I said, missing the point. She should be having these discussions with David. And the parties do communicate primarily through e-mail or essentially solely through e-mail. So there is that platform established for them to have these discussions that could then show that the court is misunderstanding the evidence. However, upon review of the 300 or 200-plus pages of exhibits in this matter, I think the court will see that it's a constant pattern. And it hasn't changed in the, however, four years since this case started. It hasn't changed that Hawley will make these decisions, inform David, David will send her an e-mail telling her that he's frustrated that she's doing that, and that she will apologize or ignore him or just continue essentially on the same pattern. The findings of the trial court, as I stated, are based on the factors outlined in 602, I think 0.7 is the new statute. And they are completely in line with the evidence presented, with the exhibits that are included in the record and with the testimony of the parties. A lot of these allegations Hawley has admitted to in her testimony, in being crossed by counsel for David, this isn't a case where one attorney was just better than the other. Hawley actually had two different attorneys throughout these proceedings. This is a case where the evidence has been so clear that the trial court, who is in a better position to judge the personalities and temperaments and assess the credibility of the witnesses, has made the same decision twice and has affirmed that decision through multiple motions to reconsider and multiple other motions hearings. A lot of this is fact-based, and so I don't want to get into specific wording in each e-mail with the court, as that is in the brief. But I do believe that the court will see upon reviewing those exhibits and those e-mails and the actual timeline that took place, not what Hawley is now alleging, that the court will see that this pattern of Hawley to make these decisions on her own has continued, even after being sanctioned, even after being punished by the trial court. And essentially, we are asking this court to affirm the order of the trial court and deny the appeal filed by Hawley. Thank you, Ms. Lindberg. Mr. Blunt, do you have rebuttal? Thank you again, Your Honor. I did find that on the first page of the court's order, the one appealed before the post-trial motion, at C-235, so that will also be in the appendix of the brief, the court says, That's a quote. The misleading I'm talking about is that this order, the same order, was filed and my client filed a post-trial motion. We came into court. The misleading was not saying at that point, yes, Your Honor, not to take away from your judgment, but this was wrong and that was wrong and that was wrong, but you wrote them. And I know they're wrong because I sent the e-mails and they're in the record. And, Your Honor, I should have told you and they should have told her. And now maybe they'll have to pay for it. I don't know if this court deems this worthy of sending back. Who objects to their child having insurance? It's just a side comment, but is that in the best interest of your child to object to your child having insurance? Well, I guess I was trying to think through that and if it meant that the other side then wasn't aware of the medical care, that could be an issue, right? It could, although I don't see that it was ever spun that way. It was a straight-up fight about, I don't like my husband's insurance on my kid. I mean, that's what the e-mails said. Okay. And frankly, it was. It was like, well, he's gone. What if he's gone? What happens to his insurance? Well, they were getting married. What I just heard was an argument that this judgment is not contrary to the manifest way to the evidence. And we're not arguing that it is contrary to the manifest way to the evidence. We're saying it's unjust because there were so many mistakes made. And by the way, I didn't hear any defense of the judge on the mistakes, not one of them. The first trial, the judge did not have the exhibits. The second trial, the judge apparently didn't study the exhibits. But somehow the exhibits aren't getting through here. And maybe if this court sends back a third time, it would be a charm, and the judge will look at the exhibits that she had last time, and she'll maybe read them this time. Again, this court may think that this is a suit of all hell. And why send it back? Why waste the partner's money? Why waste the judge's time? There's no way that a judge is going to change her mind on this. But if this court has any doubt, if this court has any question at all, isn't that best left to the trial judge to decide whether what we found is enough? Isn't that best left to the trial judge to decide if that is significant enough to change this judgment? And if the judge says no, then it is no. But I submit, unless it's a very, very slam dunk, that that is the trial judge's call. Thank you. Thank you both for your briefs and arguments. We'll take the matter under advisement.